**PRESBYTERIAN/ST. LUKE'S MEDICAL CENTER, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**St. Luke's Federation of Nurses and Health Professionals, Intervenor.**

No. 81–2107.

United States Court of Appeals, Tenth Circuit.

Dec. 23, 1983.

Gina Kaiser and Clifton L. Elliott of El-liott, Kaiser & Freeman, Kansas City, Mo., for petitioner.

Jerrold Wohlgemuth, Atty., N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associ-ate Gen. Counsel, James D. Donathen, and Allison W. Brown, Jr., Attys., Washington, D.C., on brief), for respondent.

Michael Radzilowsky and Lawrence A. Poltrock of DeJong, Poltrock & Giampietro, Chicago, Ill., adopted brief of respondent, for intervenor.

Before BARRETT, LOGAN and SEY-MOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

This case is before us on the petition of Presbyterian/St. Luke's Medical Center (the Center) to review and set aside an order of the National Labor Relations Board (NLRB or the Board) and on the cross-application of the Board for enforce-

ment of its order. The Board found that the Center committed numerous unfair labor practices in violation of sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3) (1976) (the Act), and ordered affirmative relief. Based on our review of the record as a whole, we hold that substantial evidence supports the Board's findings and conclusions. Accordingly, we grant enforcement of its order.

## I.

### BACKGROUND

Presbyterian/St. Luke's Medical Center is a multi-facility health care institution with two hospitals in Denver and a third hospital in Aurora, Colorado. The present entity is the result of a July 1979 merger between two formerly separate organizations, St. Luke's Hospital Association and Presbyterian Medical Center. This case involves only the Center's St. Luke's facility, located in Denver.

In July 1979 registered nurses (RNs) and licensed practical nurses (LPNs) at the Center's St. Luke's facility began to discuss union organization. By early September union-authorization card solicitation was underway, and on October 5, St. Luke's Federation of Nurses and Health Professionals (the Union) filed two election petitions with the NLRB. One petition covered RNs; the other covered technical employees, including LPNs. Elections were held January 10, 1980. The RNs voted for union representation and the technical employees voted against it.

During the course of the organizational campaign, the Center engaged in a variety of conduct that prompted the Union to file unfair labor practice charges with the NLRB. The Board issued two complaints which were consolidated and set for hearing before an administrative law judge (ALJ). After six days of testimony, the ALJ determined that the Center had committed a number of unfair labor practices and ordered various types of relief. With a few exceptions, the Board affirmed the rulings, findings, and conclusions of the ALJ. The Board found that the Center had violated section 8(a)(1) of the Act by promulgating,

maintaining, enforcing, and threatening to enforce certain no-solicitation and distribution rules; by polling employees with regard to their grievances and creating the impression such grievances would be satisfied in order to discourage employee support for the Union; and by interrogating employees concerning their union activities. It further found that the Center had violated section 8(a)(3) of the Act by discharging registered nurse Lauren Hammond, and by reprimanding or issuing written warnings to Hammond and four other employees. The Board ordered the Center to cease and desist from further violations of the Act, to revoke its no-solicitation rule, to rescind the reprimands referred to above, to offer reinstatement with backpay to Lauren Hammond, and to post in the hospital an explanatory notice indicating the Center's intent to comply with the Board's order. It also ordered that a second election be held among the employees in the technical unit.

For ease of analysis, we shall set forth separately below the facts relating to each violation of the Act.

## II.

### THE UNFAIR LABOR PRACTICES

On review of an NLRB order, a court should grant enforcement if the Board correctly interpreted and applied the law and if its findings are supported by substantial evidence in the record, considered in its entirety. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488–91, 71 S.Ct. 456, 464–66, 95 L.Ed. 456 (1951); *NLRB v. Carbonex Coal Co.,* 679 F.2d 200, 203 (10th Cir.1982). Section 10(e) of the Act provides that as to questions of fact, the findings of the Board are conclusive if supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) (Supp.1981). Substantial evidence has been defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Universal,* 340 U.S. at 477, 71 S.Ct. at 459 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938) ). Although the statute does not

expressly limit the scope of our review concerning questions of law, "the experienced judgment of the Board is entitled to great weight." *Crane Sheet Metal, Inc. v. NLRB,* 675 F.2d 256, 257 (10th Cir.1982). We are not free to overturn the Board's decision because we might have decided the matter differently. *NLRB v. Pepsi-Cola Bottling Co. of Topeka,* 613 F.2d 267, 270 (10th Cir. 1980); *see Universal,* 340 U.S. at 488, 71 S.Ct. at 464–465; *NLRB v. Albion Corp.,* 593 F.2d 936, 939 (10th Cir.1979). Rather, it is our responsibility to ascertain that the Board acts within reasonable bounds and that the supporting evidence is truly substantial. *Universal,* 340 U.S. at 490, 71 S.Ct. at 465–466; *Pepsi-Cola,* 613 F.2d at 270.

### A. Section 8(a)(1) Violations

 It is an unfair labor practice under section 8(a)(1) of the Act for an employer "to interfere with, restrain, or coerce employees" in the exercise of the rights of self-organization and collective bargaining guaranteed by section 7 of the Act. 29 U.S.C. § 158(a)(1) (1976); *see id.* § 157. The test for violations of section 8(a)(1) is not whether an attempt at coercion has succeeded or failed, but "whether the employer engaged in conduct which reasonably tends to interfere with, restrain, or coerce employees in the free exercise of their section 7 rights." *NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679, 689 (7th Cir. 1982); *see Hedstrom Co. v. NLRB,* 629 F.2d 305, 314 (3d Cir.1980), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981).

### 1. The No-Solicitation Rules

During the period that organizational activity was underway at St. Luke's, the Center maintained at various times three different no-solicitation/distribution rules. The Board found each of the rules facially invalid and determined that the Center had violated section 8(a)(1) of the Act by promulgating, maintaining, and enforcing the rules. The Center apparently does not contest the Board's finding as to the first rule, which was in effect from mid-April to mid-September of 1979. Accordingly, we confine our analysis to the two subsequent rules, designated herein as Rules Two and Three.

Rule Two, issued on or about September 15, 1979, provided:

"Because our patients are in areas throughout the hospital and because our medical staff has determined that tranquility is essential to proper patient care, the Medical Center, in cooperation with the medical staff, has adopted the following rule:

Except to solicit participation in official Medical Center employee programs, no employee shall solicit any other employee of the Medical Center for any purpose at any time in any area to which patients have access. This prohibition includes, among other areas, hallways, stairs, waiting rooms, elevators, and patients' and visitors' lounges.

Employees may engage in solicitation of other employees only when both employees are on non-working time and only in areas to which patients do not have access.

No employee shall distribute any matter of any kind in any areas of the Medical Center except in non-working areas to which patients do not have access.

At no time shall any employee solicit any patient or visitor for any purpose, nor shall any employee distribute any matter to patients or visitors.

This prohibition does not apply during non-working time in the cafeterias at any of the campuses, or during non-working time in the coffee shop at the Denver Presbyterian campus between the hours of 8 p.m. and 8 a.m."

Rec., vol. III, at 1430–31.

On or about October 18, 1979, the Center again revised its no-solicitation rule. Rule Three provided:

"Effective immediately the following rule will be in effect at all locations in the Medical Center.

Employees will not engage in any activity during their on-duty time which takes

them away from devoting full attention to their responsibilities.

Employees shall not engage in solicitation of other employees on *either* the working (on duty) time of the employee doing the solicitation or the employee being solicited.

Employees shall not distribute any matter on their working time or in any working area.

The rule will be strictly enforced.

This rule is less restrictive than the rule which has been in effect because we believe employees will use reason and good judgment in all areas of the Medical Center, particularly those areas of patient care and where patients and their visitors have access. Naturally *any* activity which is disruptive to the care of the patient or atmosphere of patient care will not be tolerated."

Rec., vol. III, at 1431 (emphasis in original).

█ It is well established that "the right of employees to self-organize and bargain collectively . . . necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." *Beth Israel Hospital v. NLRB,* 437 U.S. 483, 491, 98 S.Ct. 2463, 2469, 57 L.Ed.2d 370 (1978) (footnote omitted). Pursuant to this observation, the Supreme Court has approved the Board's presumption that restrictions on employee solicitation during non-working time violate section 8(a)(1) of the Act unless the employer justifies them by showing special circumstances which make the rule necessary. *Id.* at 492–93, 98 S.Ct. at 2469–2470; *see Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). Hospitals, of course, "are not factories or mines or assembly plants." *Beth Israel,* 437 U.S. at 509, 98 S.Ct. at 2477 (Blackmun, J., concurring). Thus, in the context of health care facilities, the Board has modified its presumption to permit prohibitions on solicitation in "strictly patient care areas, such as the patients' rooms, operating rooms, and places where patients receive treatment, such as x-ray and therapy areas." *Id.* at 495, 98 S.Ct. at 2470 (quoting *St. John's Hospital & School of Nursing, Inc.,* 222 N.L.R.B. 1150, 1150 (1976)). Other than in im-

mediate patient care areas, however, the presumption continues to apply. Under the Board's approach, the hospital bears the burden of proving that union solicitation outside of immediate patient care areas is likely to adversely affect patients or patient care. *NLRB v. Baptist Hospital, Inc.,* 442 U.S. 773, 781 & n. 11, 99 S.Ct. 2598, 2603 & n. 11, 61 L.Ed.2d 251 (1979).

In the case before us, Rule Two's ban on solicitation "in any area to which patients have access" necessarily encompasses a much broader range of areas than immediate patient care areas. Indeed, the Board found that at least some patients at St. Luke's had access to virtually every area in the hospital not specifically denied to public use. As such, the Board properly determined that the Rule was presumptively invalid and that the Center had the burden of justifying the ban. The hospital's Director of Medicine, Dr. John F. Mueller, explained the Center's rationale for the rule. He testified that solicitation, and particularly discussions of unionization, could disturb the "tranquil" atmosphere desired in a hospital and create stress for patients exposed to such activity. Dr. Mueller conceded, however, that he had observed no adverse effects on patient care as a result of organizational activity at St. Luke's. As the Board observed, his testimony was "based upon abstract notions or experiences other than at the facility." Rec., vol. III, at 1434.

█ The Board concluded that the Center's rationale justified a ban on solicitation in areas predominantly used by patients, including the hallways, elevators, and stairways used to transport patients and emergency equipment. It could find no evidence, however, justifying the prohibition of solicitation in *all* areas to which patients have access—particularly areas like main entrances, lounges, stairs, and corridors in areas not dedicated to patient care, which, while accessible to ambulatory patients, are for general use by everyone at the facility. As to these areas, the Board determined that the Center failed to meet its burden of proof. *Cf. Baptist Hospital,* 442 U.S. at 785–86, 99 S.Ct. at 2605–2606.

Based on our review of the record as a whole, we agree that the Center showed at most a possibility that solicitation in such areas might adversely affect patient care. The Center made no showing that patient disruption would be likely to occur. Accordingly, we will not disturb the Board's finding that Rule Two was overbroad and invalid. In promulgating, maintaining, and enforcing this rule, the Center violated section 8(a)(1) of the Act.[1]

■ Substantial evidence also supports the Board's finding as to the facial invalidity of Rule Three. Although the rule does not specifically ban solicitation during employees' non-working time, it contains vague language that could be construed or enforced so as to prohibit presumptively proper conduct. The last paragraph of the rule is particularly troubling. As the Board pointed out, "the admonition that [the Center] will 'not tolerate' activity 'disruptive of the atmosphere of patient care' is unclear. The use of the 'atmosphere' metaphor is ethereal, but the threat is fundamental. Employees are unsure of what is permitted, but are certainly aware that some activity will not be tolerated." Rec., vol. III, at 1437. Because of this lack of clarity, the Board determined that Rule Three was ambiguous and thus fatally overbroad and invalid. The record supports the Board's finding. The Center violated section 8(a)(1) by promulgating, maintaining, and enforcing this rule.

2. Solicitation of Employee Grievances

In mid-October of 1979, the Center conducted an attitude survey among some 3,000 employees at its three facilities. The survey, which was announced on September 25, inquired broadly into employee attitudes concerning their conditions of employment. According to the Center, the survey was intended to solicit employee input regarding anticipated changes in wages and fringe

benefits. Such changes were necessitated by the July merger that had brought together two formerly distinct entities with differing wage scales and benefit programs. The Board found that despite this business justification for an employee poll, the survey was at least in part designed to undermine employee support for the Union by soliciting employee grievances and impliedly promising to redress them.

■ Grievance solicitation during the pre-election period is not in itself a violation of the Act. However, it constitutes an unfair labor practice if the employer also promises or implies that it will remedy the grievance if the union is rejected, *NLRB v. Arrow Molded Plastics, Inc.,* 653 F.2d 280, 283 (6th Cir.1981); *NLRB v. Garry Manufacturing Co.,* 630 F.2d 934, 943 (3d Cir. 1980), or if its promise or implication otherwise serves as an inducement to vote against the union, *see Hedstrom Co. v. NLRB,* 558 F.2d 1137, 1142 n. 12 (3d Cir. 1977), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981). Such conduct is viewed as coercive "because it lulls employees into believing that they can obtain the benefits being promised by the union without the union's aid." *NLRB v. K & K Gourmet Meats, Inc.,* 640 F.2d 460, 466–67 (3d Cir.1981). Thus an employer violates section 8(a)(1) of the Act by soliciting grievances where the solicitation is " 'accompanied by an express or implied promise of benefits specifically aimed at interfering with, restraining, and coercing employees in their organizational effort.' " *NLRB v. Tom Wood Pontiac, Inc.,* 447 F.2d 383, 384–85 (7th Cir.1971) (quoting *ITT Telecommunications,* 183 N.L.R.B. 1129, 1129 (1970)); *NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679, 691 (7th Cir.1982).

■ In the present case, the record plainly shows that the attitude survey solicited employees' work-related grievances

---

1. The Center urges throughout this appeal that at no time did it enforce its no-solicitation/distribution rules. It maintains that each incident alleged to be an application of a rule was in fact discipline for using work time for non-work related matters. The record indicates, however, that the Center's supervisory person-

nel were fully advised of the rules and their purpose. It can reasonably be inferred from the events described infra that the no-solicitation rules were at least implicitly enforced—particularly against union activity—even if no discipline was meted out expressly pursuant to such a rule.

during the height of the union campaign. The survey was conceived and announced prior to the filing of election petitions, but well after organizational activity was underway at the hospital. The Center began conducting the poll on October 19, two weeks after the petitions were filed. The questions in the survey were not restricted solely to wages and benefits but inquired broadly into employees' satisfaction with and attitude toward supervisors, administrators, co-workers, personnel policies, job security and advancement, communication channels, and general working conditions. This evidence, particularly when viewed in conjunction with the Center's other anti-union conduct discussed below, lends credence to the Board's conclusion that it was the union campaign, as much as the business necessity of standardizing working conditions, that prompted the decision to conduct the survey.

The record also supports the Board's conclusion that the Center impliedly promised to redress employee grievances. In a September 25 letter announcing the survey, the Center reminded employees that it was in the process of reviewing and consolidating benefits, policies, and employment practices and indicated that input from the hospital staff would be important factors in such decisions. In October, at the commencement of the survey, the Center emphasized in a memorandum to employees that no final decisions regarding benefits would be made until the results of the survey had been analyzed. The memo added that the survey results would be "a major factor taken into consideration in arriving at a final benefit design." Rec., vol. II, at 1169. Thus, substantial evidence supports the Board's finding that the Center violated section 8(a)(1) of the Act by polling employees regarding their grievances and creating the impression that such grievances would be satisfied.

### 3. Interrogation of Employees

Substantial evidence also supports the Board's finding that the Center violated section 8(a)(1) by interrogating employees concerning their union activities. Such questioning, though not per se violative of the Act, is prohibited by section 8(a)(1) if accompanied by coercion, threat, or restraint. *Coors Container Co. v. NLRB,* 628 F.2d 1283, 1289 (10th Cir.1980); *Groendyke Transport, Inc. v. NLRB,* 530 F.2d 137, 144 (10th Cir.1976). The test is not whether employees were actually coerced, but whether the questioning tended to be coercive. *Hedstrom Co.,* 558 F.2d at 1143 n. 13; *NLRB v. Camco, Inc.,* 340 F.2d 803, 804 n. 6 (5th Cir.1965). A violation is established "if the questions asked, when viewed and interpreted as the employee must have understood the questioning and its ramifications, could reasonably coerce or intimidate the employee with regard to union activities." *NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613, 624 (7th Cir.1981).

Here the record discloses numerous instances in which the Center's supervisory personnel interrogated employees about their union activities. In mid-July of 1979, the Center's assistant administrator of nursing, Pamela Van Genderen, summoned RN Lauren Hammond to her office to discuss a report that Hammond had solicited other employees regarding representation matters. Van Genderen testified she informed Hammond that the National Labor Relations Act did not permit active solicitation on work time in patient care areas. She advised Hammond that if there were any further incidents, they "would have to talk about it." Rec., vol. I, at 46. According to Hammond, she told Van Genderen that she was not trying to organize the nurses and Van Genderen replied "I would like to know what you're trying to talk to them about." *Id.* at 357. Hammond also testified that Van Genderen warned her that if she were setting herself up as a representative of the union in an attempt to organize, she might be putting her job in jeopardy. It is undisputed that Hammond was a known union activist and a leader of the organizational campaign.

About a week later, Hammond had a conversation with supervisor Eileen Deroff as she was leaving Deroff's nursing unit. According to Hammond's testimony, Deroff asked Hammond if she was assigned to that floor and Hammond told her she was not.

Deroff then asked her why she had been there, and Hammond replied that she had posted some newspaper clippings about the Denver nurses' movement on a bulletin board in the nurses' lounge. Hammond testified that Deroff started to walk away, but then turned back toward her and said, "Listen, I don't want you to repeat this to anybody, but it would behoove you to stay on the units you are assigned to." *Id.* at 275.

On October 5, 1979, Hammond and three other nurses took part in a conversation of disputed length and nature for which each of them subsequently was issued a written reprimand. The record reveals that the nurses involved were questioned individually as to the substance and duration of the conversation. RN Harlan Bishop was queried at length by Van Genderen and supervisor Lila Shafer, one of whom asked Bishop whether the conversation had involved any discussion of union activities.

Sometime later, one of the disciplined nurses, RN Marcia Sherrill, approached Lila Shafer and sought to have the reprimand removed from her record. According to Sherrill's testimony, Shafer refused to do so, telling Sherrill that Lauren Hammond had been "getting sloppy about where she was having her union meetings and things." *Id.* at 287. She also warned Sherrill, "If you're going to play these games concerning the union, you have to play by the rules.... The employer makes the rules, and you have to play by those rules."[2] *Id.*

Finally, RN Janet Morrison testified to a brief conversation in October with Dr. Elmira Price, a consultant who had been hired by the Center to assist with staffing problems. At the conclusion of a meeting between Dr. Price and the nurses, Price and Morrison reached the door at the same time. According to Morrison's testimony, Dr. Price began talking to her and asked if she thought a union was going to solve the nurses' problems.

■ The Board determined that these incidents, separately and as a course of con-

duct, were designed to and did chill the nurses' organizational activity by showing the Center's interest in and hostility to the Union. It thus found the Center's conduct violative of section 8(a)(1) of the Act. Based on our review of the entire record, we agree that the Center interrogated and impliedly threatened its employees in violation of section 8(a)(1). The Center's conduct, amply documented in the record and occurring in the midst of the Union's organizational drive, reasonably tended to interfere with, restrain, and coerce the employees in the exercise of their section 7 rights.

### B. Section 8(a)(3) Violations

■ Section 8(a)(3) of the Act prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...." 29 U.S.C. § 158(a)(3) (1976). The central issue in a section 8(a)(3) claim is whether the employer's actions are motivated by anti-union considerations. *Berger Transfer & Storage Co.,* 678 F.2d at 691. Proof of a specific intent to discriminate, however, is not necessary. Such intent may be presumed from the evidence. *NLRB v. American Can Co.,* 658 F.2d 746, 754 (10th Cir.1981). Moreover, when discriminatory intent is established, the employer's actions need not actually have the effect of encouraging or discouraging union membership. *Id.*

1. Reprimands of Lauren Hammond, Kathy Bitzer, Harlan Bishop, Marcia Sherrill, and Sharon Luhrs

The record confirms that at about 7:00 p.m. on October 5, 1979, RNs Lauren Hammond, Harlan Bishop, and Marcia Sherrill and LPN Kathy Bitzer engaged in a conversation near the entrance to the old medication room on nursing unit 2B-South. Although the exact length and nature of this meeting is in dispute, at some point in the conversation, Bitzer asked Hammond for a

---

**2.** Although Shafer's statements may be characterized more accurately as veiled threats than interrogation, such conduct is equally violative

of section 8(a)(1). *See NLRB v. Gold Spot Dairy, Inc.,* 417 F.2d 761, 762–63 (10th Cir. 1969).

union authorization card. Hammond told her the matter would have to wait until after work.

A portion of this meeting was observed by nurses' aide Carolyn Voss. Voss' recollection of the incident was eventually reported, through her supervisor, Lila Shafer, to assistant administrator Pamela Van Genderen. Van Genderen then interviewed Voss and most of the participating nurses. Based on the information she obtained from these employees and from consulting that evening's hospital records, Van Genderen determined that the nurses should be counseled. On October 18 she issued written reprimands to Bitzer, Bishop, and Sherrill which stated: "On October 5, 1979, during the evening shift on 2B-South, you stopped work to meet with other staff members to discuss non-work related matters. This interruption of duty is negligent of your responsibility for patient care. Any further activity of this type will result in your termination." Rec., vol. II, at 1139–41. Hammond received a similar reprimand.

The Board found that these reprimands were issued not, as the Center maintained, because of concern for patient care, "but rather as part of its enforcement of its overly broad no-solicitation rules and as part of a plan to discourage union organization at its facility by punishing union adherents, particularly Hammond." Rec., vol. II, at 1444. The Board concluded that by issuing the reprimands, the Center violated sections 8(a)(3) and 8(a)(1) of the Act.

This finding is based to a great extent on certain credibility determinations made by the ALJ which the Board adopted. It is settled that credibility determinations are particularly within the province of the hearing examiner and the Board and, as such, are generally entitled to affirmance on review by a court of appeals. *See, e.g., NLRB v. Wilhow Corp.,* 666 F.2d 1294, 1299–1300 (10th Cir.1981); *Osteopathic Hospital Founders Association v. NLRB,* 618 F.2d 633, 637 (10th Cir.1980); *NLRB v. Pepsi-Cola Bottling Co.,* 613 F.2d 267, 271 (10th Cir.1980). Absent extraordinary circumstances, we do not substitute our view of credibility for that of the ALJ, *NLRB v.*

*Dillon Stores,* 643 F.2d 687, 692 (10th Cir. 1981), nor do we weigh the credibility of one witness against another and search for contradictory inferences, *Wilhow,* 666 F.2d at 1299; *NLRB v. Montgomery Ward & Co.,* 554 F.2d 996, 999 (10th Cir.1977). Moreover, that the ALJ and the Board uniformly credited employees' witnesses and discredited those of the employer does not in itself entitle such findings to less weight if the Board advances plausible reasons for its findings. *See Wilhow,* 666 F.2d at 1300; *Dillon,* 643 F.2d at 692.

In the present case, the Board specifically discredited the testimony of Carolyn Voss, based on her demeanor and the inherent improbability of the events as she related them. Voss testified that she had observed portions of the October 5 meeting, that it had lasted about an hour, that she believed it concerned union matters, and that as a result of the meeting she had had to work past the end of her shift. Other evidence in the record, however, indicated that Voss' overtime was necessitated by a heavy press of work late in the evening brought on by an unusually large number of patient admissions. Voss first reported the incident to her supervisor several days later as an explanation for having worked overtime. The Board reasonably observed that in seeking to justify her overtime hours, Voss had a motive to exaggerate the duration and effect of the meeting.

On the other hand, the Board characterized the testimony of the nurses involved as "truthful and direct." Rec., vol. III, at 1443. Bishop testified that the conversation was unstructured and unplanned, lasting about fifteen minutes. Bitzer testified that it lasted less than a minute and involved no more than her asking Hammond for a registration card and Hammond telling her she could get one after work. Hammond and Sherrill had no recollection of the meeting. Crediting this testimony, the Board found that the October 5 meeting was unstructured, coincidental, and spontaneous, and only a few minutes in duration. It concluded that the incident was too inconsequential to have merited discipline even under a valid no-solicitation rule.

We agree. The record reveals that non-work related discussions routinely occurred during work time and in patient care areas. Employees also bought and sold commercial goods such as Amway and Avon products while working at the hospital. There is no indication in the record that anyone was ever disciplined for such activities. This evidence, the Board's credibility determinations, and the Center's demonstrated hostility to the Union substantially support the Board's finding that the Center violated sections 8(a)(3) and 8(a)(1) of the Act by reprimanding the nurses involved in the October 5 conversation.

Likewise, the record adequately supports the Board's finding that the Center violated sections 8(a)(3) and 8(a)(1) when it reprimanded LPN Sharon Luhrs for "going to other units to discuss non-work related matters." Rec., vol. II, at 1173. The record reveals that Luhrs was a known union supporter and had attended an NLRB hearing concerning the Union's representation petitions the day before she was reprimanded. The events referred to in the letter of reprimand occurred while Luhrs was either off-duty or on break. Both incidents were, like the October 5 meeting, of minimal duration and resulted in no neglect of patient care. Indeed, the record discloses nothing out of the ordinary about either of Luhr's brief conversations. The very triviality of these incidents lends considerable support to the Board's conclusion that it was union concern, rather than patient concern, which prompted the Center's disciplinary action against Luhrs.

## 2. Discharge of Lauren Hammond

Whether the Center violated sections 8(a)(3) and 8(a)(1) of the Act when it discharged RN Lauren Hammond is, in our view, a more troubling question. Hammond was fired on October 18, 1979, two days after she had delayed approximately twenty minutes in responding to a page over the hospital's loudspeaker system. The record indicates that Hammond was first paged shortly after 7:45 a.m. on October 16. At the time, she was engaged in a conversation and did not respond. Approximately fifteen to twenty minutes later, Hammond's name was called again. When, after a few minutes, she did not respond to the second page, the paging clerk, in accordance with normal procedure, paged Hammond "stat," meaning she should respond at once. Hammond immediately answered this "stat" page.

Assistant Administrator Van Genderen learned of this incident indirectly on October 17. The following day, she met with Diabetic and Stroke Clinical Specialist Gail Moore who had witnessed Hammond's actions.[3] Based on Moore's report and her own subsequent examination of the hospital paging records, Van Genderen decided to terminate Hammond. After discussing the matter with Hospital Administrator David Lenz and the Center's legal counsel, she had Hammond's termination papers and final paycheck prepared. That afternoon she called Hammond to her office and, after briefly questioning her about the paging incident, Van Genderen told her that she was terminated. Hammond was given her final paycheck and escorted off the premises.

Shortly thereafter, Van Genderen placed the following written statement in Hammond's personnel file:

"On October 5, 1979 you interrupted your duties to meet and discuss with other employees non-work related matters. On October 16, 1979 you again interrupted your duties for non-work related matters. You failed to answer your page several times until finally a double page STAT was given.

"Because of this neglect of duty, your employment is terminated."

*Id.* at 1138. The Board found that the Center terminated Hammond "not because of a belief that patient care had suffered through her conduct, but rather as punishment for Hammond's union activities and as a means of chilling the union activities of others." Rec., vol. III, at 1446. It conclud-

---

3. At the hearing, Moore testified without contradiction as to the October 16 paging incident. The Board characterized her testimony as clear and persuasive.

ed that the discharge constituted a violation of sections 8(a)(1) and 8(a)(3) of the Act.

In reaching this conclusion, the Board allocated the burden of proof in accordance with its decision in *Wright Line,* 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Under the *Wright Line* analysis, a prima facie violation of section 8(a)(3) is made out when the NLRB General Counsel establishes that anti-union animus contributed to an employer's decision to discharge or otherwise discipline an employee. Once anti-union animus is proven, the burden shifts to the employer to demonstrate that it would have fired the employee in any event on the basis of his or her conduct. *Id.* at 1089.

■ In *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Supreme Court approved the Board's burden-shifting approach to such cases. The Court explained that

> "the unfair labor practice consists of a discharge or other adverse action that is based in whole or in part on anti-union animus—or as the Board now puts it, that the employee's protected conduct was a substantial or motivating factor in the adverse action. The General Counsel has the burden of proving these elements under § 10(c). But the Board's construction of the statute permits an employer to avoid being adjudicated a violator by showing what his actions would have been regardless of his forbidden motivation."

*Id.* at 2474. The employer's burden is, as the Court recognized, an affirmative defense. *Id.* at 2473, 2475. Thus, where anti-union animus is established, the employer will be found in violation of 8(a)(3) unless it demonstrates "by a preponderance of the evidence that the worker would have been

fired even if he had not been involved with the Union." *Id.* at 2471.

Applying this test to the case at bar, the Board found "that [the Center] had animus against Hammond because of her union activities and [that it had] a clear record of violating the Act with respect to her." Rec., vol. III, at 1444. It thus concluded that a prima facie case of illegal discharge was established and placed the burden on the Center to show "that a permissible basis for the discharge would have caused the discharge irrespective of the protected conduct and the wrongful actions of [the Center]." *Id.*

■ Based on our review of the record, we believe the Board correctly shifted the burden of proof. As noted above, Hammond was a leading union organizer. She had been active in distributing union authorization cards, and personally had delivered copies of the union's election petition to Hospital Administrator David Lenz. In view of the Center's previously discussed anti-union conduct, we conclude that Hammond's union activities clearly were a "motivating factor" in the Center's decision to discharge her.[4]

The question thus becomes whether, absent its demonstrated hostility to the union, the Center nevertheless would have terminated Hammond. Pamela Van Genderen testified that the decision was based on three incidents involving Hammond's use of work time for non-work related matters: a report Van Genderen had received in mid-July of Hammond soliciting nurses on work time regarding representation matters; the October 5 meeting; and the October 16 paging incident. Of these, the latter was the precipitating event and the only one which could plausibly be viewed as serious enough to have caused Hammond's termination independently of union considerations.

---

4. We note that the Board specifically discredited Van Genderen's assertion that her decision to terminate Hammond was free of anti-union considerations. It described her demeanor as to her motive testimony as "singularly unimpressive." Rec., vol. III, at 1446. Moreover, the letter placed in Hammond's file specifically refers to the October 5 meeting as a factor in

the discharge decision. We have already upheld the Board's finding that the Center's actions concerning that meeting interfered with protected activity and violated the Act. Thus to the extent the October 5 incident played a role in the decision to discharge Hammond, the decision necessarily was improperly motivated.

The evidence indicates that Hammond, as an intravenous (IV) nurse, was responsible for starting and monitoring IV infusions throughout the hospital and consequently was not usually in one place for any length of time. She received most of her work assignments from calls over the hospital's paging system, which was the only effective means by which she and other IV nurses could be reached regarding work assignments, personal messages, or any other matters. Responding to pages was unquestionably part of Hammond's responsibility as an IV nurse. Although she testified that she did not recall receiving a stat page on the morning of October 16, she admitted that it would be unacceptable conduct for an IV nurse to take ten minutes to finish a social conversation when she had been paged. According to Gail Moore's uncontradicted testimony, Hammond's delay in responding to her pages that morning was closer to fifteen or twenty minutes.

It is thus clear that the Center could justifiably have discharged Hammond on the basis of her conduct on October 16. Indeed, "an employer may dismiss an employee for any reason or no reason at all, so long as hostility towards the employee's union activities does not enter into the decision." *NLRB v. Dillon Stores,* 643 F.2d at 692. In the present case, however, we have determined that the Center's anti-union animus did play a part in its decision to terminate Hammond. The issue therefore is not whether the Center could have discharged Hammond for her actions, but whether it *would* have done so regardless of her union activities. Based on our review of the rec-

ord as a whole, we agree with the Board's conclusion that the Center failed to prove by a preponderance of the evidence that it would have fired Hammond absent its illegal discrimination against her for her earlier protected activities.

The record demonstrates that IV nurses were paged on a frequent basis throughout the day and often delayed responding to non-stat pages. It was in fact standard practice for the hospital paging clerk to issue second and third pages as necessary in order to contact IV nurses. Both Hammond and IV nurse Janet Morrison testified that they frequently failed to respond to first pages. According to Morrison's testimony, which the ALJ found to be credible, the nature of an IV nurse's duties often made immediate responses to pages impractical. She testified that due to the preparation time involved in setting up an IV, she normally could count on a fifteen to twenty-minute leeway between the time she first heard a page and the time the IV actually would be ready for her to administer. In Morrison's opinion, a delay of ten minutes or more in responding to a page was neither unacceptable nor unusual conduct. She stated: "I know from my own routine and experience as a nurse, I'm not neglecting my duties as a nurse by waiting 15 to 20 minutes. It's not going to get done any faster if I answer the page immediately or if I answer it in 15 minutes." Rec., vol. I, at 562. Morrison further testified that she often delayed answering her pages for fifteen to twenty minutes when she was busy. She stated that, based on her direct observations, other IV nurses routinely did the same.[5]

---

5. Morrison testified as follows:
 "JUDGE ANDERSON: Do you have knowledge of the way other IV nurses at St. Luke's Hospital answer normal pages? That's a yes or no question.
 "THE WITNESS: Yes.
 "JUDGE ANDERSON: What is your knowledge?
 "THE WITNESS: Most IV nurses answer their pages when they can. If they're busy, they do their work. If they're not busy, they may answer it or they may finish what they're doing. I think every IV nurse on the team knows she has some leeway on the call

made and the actual setup before she has to do the actual IV.
 "JUDGE ANDERSON: Have you actually observed such a lag time between a call being heard by an IV nurse and the answering of that page?
 "THE WITNESS: Yes.
 " . . . .
 " . . . .
 "JUDGE ANDERSON: How many separate persons who are IV nurses have you observed in such a situation?
 "THE WITNESS: Every other member of the IV team."
 Rec., vol. I, at 570–71.

The record shows that aside from Hammond, no other employee had ever been fired or disciplined in any way for failing to respond to a page. According to Van Genderen, this was because no such incident had previously been brought to her attention:

"Q How many employes have you terminated for not answering a page?

"A No one.

"Q Do you regularly keep track of pages and how many of them are not answered?

"A No.

" . . . .

" . . . .

" . . . .

" . . . .

"Q How many other employees have you checked to see whether they have answered all of the pages that they have had?

"(Pause.)

"Q (By Mr. Radzilowsky) Are you saying none?

"A (Witness nods.)

"Q Aren't you putting Lauren's behavior under a microscope?

"MR. ELLIOTT: Objection.

"A (By the Witness) Any other employee, that would happen to.

"JUDGE ANDERSON: Overruled. I think it's a permissible line of questioning.

"MS. KAISER: I did not hear the answer. Can you repeat it?

"JUDGE ANDERSON: Can you repeat your answer?

"A (By the Witness) I said any other person, that if it had been reported I would have counseled. No one has ever reported to me that someone has not answered pages. So, I had not counseled them.

"Q (By Mr. Radzilowsky) You're saying that no one has ever, in the time that you have worked at the hospital, deemed it necessary to report to you that someone had missed a page?

"A No.

"Q Don't you think it was strange they reported this to you, this particular incident?

"A No."

*Id.* at 143–44.

Van Genderen further testified that she was unaware of how often nurses failed to respond to first or second pages. In fact, her testimony establishes that prior to this incident she had no knowledge at all of the normal practices of IV nurses in receiving and responding to pages. Upon learning of Hammond's actions, however, Van Genderen made no attempt to determine the frequency of such occurrences or otherwise inquire into the practices of other nurses. Contrary to normal hospital policy, she decided to terminate Hammond and had her final papers prepared before even discussing the matter with her.

We think it significant also that subsequent to Hammond's discharge, the Center changed its paging procedure. Under the new system, IV nurses were no longer paged for non-stat assignments. Instead, they were required to telephone the paging clerk every half hour to receive their messages. As the Board properly observed, this new procedure is evidence that the Center did not consider delays of up to a half hour in receiving non-stat messages inimical to patient care.

The above evidence, although not conclusive, strongly suggests that the significant aspect of this incident—and the precipitating factor in the Center's discharge decision—was not that a nurse failed to respond promptly to her pages, but that the nurse was Lauren Hammond. We do not think it was unreasonable for the Board to view this event as a mere pretext seized upon by the Center to justify the termination of a leading union activist.[6] Absent the Center's

---

**6.** We find the Board's reasoning on this issue logical and compelling:

"It was conceded that VanGenderen had never received or known of a complaint that an employee had not answered a page. No rule addressed such a situation other than the existing procedures which provided, at the discretion of the pager, for the placement of a 'stat' page when two nonstat pages went unanswered. VanGenderen apparently siezed [sic] upon the conclusion that two pages had been missed to fire Hammond without discussing the circumstances with her. Before the meeting at which VanGen-

animus towards Hammond's union activities, we think it unlikely that the events of October 16 would have led to her discharge.

In so concluding, we recognize that speculation as to a party's probable actions in a hypothetical situation can never be accomplished with precision. Our decision must necessarily be based on a weighing of the evidence and rational inferences therefrom, in light of the burden of proof. Here, the burden was on the Center to prove by a preponderance of the evidence that it would have discharged Hammond regardless of her protected activities. We believe substantial evidence supports the Board's finding that the Center failed to meet this burden. We thus agree that Hammond's discharge violated sections 8(a)(3) and 8(a)(1) of the Act.

### III.

### CONCLUSION

We have carefully examined all of the Center's arguments in this case and find them to be without merit. The Board's findings and conclusions are supported by substantial evidence on the record as a whole. Accordingly, the decision and order of the Board is in all respects enforced.

deren told Hammond she was fired—the only meeting in which the events were discussed —Hammond's termination papers had been prepared. At the meeting, VanGenderen did not attempt to discuss her purported fears about patient care or to question Hammond regarding IV Nurse page response procedures, even though VanGenderen at that time was admittedly ignorant of both. This evidence indicates that VanGenderen was determined to use the report of missed pages as justification for Hammond's discharge and did not wish to place her rationale at risk by inquiry of Hammond or others regarding IV Nurse page response practice or procedure. Were the preservation of patient care stan-

dards the motive for VanGenderen's action, it is much more likely she would have sought to learn of the practices of IV Nurses generally, the better to correct a practice which other employees in addition to Hammond followed. Assuming she disapproved of the IV Nurse practice, which I find included delays in responding to nonstat pages, VanGenderen could have initiated changes in the procedures by memo or otherwise. Rather, VanGenderen did not inquire and sought shelter in her professed ignorance of the IV page response practices testified to by Hammond and Morrison."

Rec., vol. III, at 1447 (footnote omitted).