**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 4/26/96**

**TENTH CIRCUIT**

READY MIXED CONCRETE
COMPANY,

      Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD,

      Respondent.

No. 95-9533

**PETITION FOR REVIEW OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD
(Board Case No. 27-CA-13393)**

Janet L. Durkin of Janet L. Durkin, P.C., Denver, Colorado, for Petitioner.

Howard E. Perlstein (Nancy B. Hunt; Frederick L. Feinstein, General Counsel; Linda R. Sher, Associate General Counsel; and Aileen A. Armstrong, Deputy Associate General Counsel with him on the briefs) of National Labor Relations Board, Washington, D.C., for Respondent.

Before **PORFILIO**, **BARRETT** and **LUCERO**, Circuit Judges.

**LUCERO**, Circuit Judge.

      Ready Mixed Concrete Company petitions for review of a National Labor

Relations Board order finding that it violated the National Labor Relations Act (the

"Act") by suspending and discharging its employee, Terry Teter, for his protected union activities. 29 U.S.C. § 158(a)(1), (3). The order requires Ready Mixed to reinstate Teter with backpay, expunge from Teter's record any reference to the suspension or discharge, and cease and desist from discriminating against employees for union activities. The Board has filed a cross-application for enforcement. Our jurisdiction to review the order arises under sections 10(e) and (f) of the Act. 29 U.S.C. §§ 160(e), (f). We deny Ready Mixed's petition and grant enforcement of the Board's order.

## I

Ready Mixed manufactures and supplies concrete to the Denver area building and construction trade, employing approximately fifty drivers. Teter was hired as a driver in 1991, and worked for Ready Mixed until his discharge on September 15, 1994. The facts leading up to Teter's discharge are disputed by the parties, but both agree that the bulk of the relevant conduct took place in the summer of 1994. In August and early September, Teter discussed with other drivers the possibility of seeking union representation and arranged union organizational meetings. The drivers had previously been represented by the Teamsters union, ending in 1988 when the unit was decertified. On August 31, while delivering a load of concrete, Teter ran over a manhole cover at the site of one of Ready Mixed's customers. On September 15, Teter was suspended and then discharged, allegedly because of the August 31 accident, failing to report the accident, and failing to wear his hardhat on the job. Later, during the hearing before the Administrative Law

Judge ("ALJ"), Ready Mixed added Teter's bad attitude as a justification for his discharge.

After the discharge, the Board's General Counsel issued a complaint, charging Ready Mixed with suspending and discharging Teter in violation of sections 8(a)(1) and (3) of the Act.[1] Following a two-day hearing, the ALJ made the following findings: Teter had engaged in protected union activity by speaking about unionizing with his coemployees, approaching the Teamsters about an organizational drive, and conducting a unionization meeting for Ready Mixed drivers; Ready Mixed harbored antiunion animus, demonstrated by remarks of a senior supervisor later involved in Teter's discharge; and Ready Mixed knew about Teter's union activities at the time of his suspension and discharge. The ALJ determined from these findings that the General Counsel had made a prima facie showing that protected conduct was a motivating factor for Teter's suspension and discharge.

Ready Mixed presented evidence at the hearing contesting the prima facie case, as well as rebuttal evidence showing that regardless of his protected activities it would have fired Teter based on the justifications it gave in his discharge letter, as well as his general bad attitude. Although the General Counsel labeled these purported justifications

---

[1] Section 8(a) makes it an unfair labor practice "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [establishing the right to collective bargaining]; . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . ." 29 U.S.C. § 158(a).

"pretexts," the ALJ nevertheless considered them carefully. The ALJ concluded that Ready Mixed would not have suspended or discharged Teter for the reasons it advanced. It found that Ready Mixed violated sections 8(a)(1) and (3) of the Act, and ordered Teter reinstated with backpay. The Board, in an order dated July 17, 1995, affirmed the ALJ's decision and adopted her recommended order. Ready Mixed Concrete Co., 317 N.L.R.B. 1140 (1995). Ready Mixed petitioned this court to review the Board's order.[2]

Petitioner raises two issues regarding the Board's conclusions. First, it argues that the General Counsel failed to prove a prima facie case that Teter's union activity was a motivating factor in his discharge. Second, it contends the Board incorrectly concluded that Teter would not have been fired for legitimate reasons. Although Ready Mixed characterizes the Board's error as misapplication of the legal test for retaliatory discharges, it is in reality alleging that the record neither supports a prima facie case nor the ALJ's failure to credit its rebuttal evidence. In particular, Ready Mixed takes issue with adverse inferences the ALJ drew from the failure of two Ready Mixed supervisors to

---

[2] After filing its complaint with the Board, the Regional Director applied for a temporary injunction in the district court for the District of Colorado, under section 10(j) of the Act, 29 U.S.C. § 160(j). The district court denied the injunction in a ruling from the bench. Clements v. Ready Mixed Concrete Co., 94-x-93 (D. Colo. Feb. 1, 1995). The Regional Director appealed the district court's denial, Clements v. Ready Mixed Concrete Co, 95-1133, which we dismissed as moot in light of the Board's order. Although Ready Mixed cites to the section 10(j) proceedings in support of its arguments, factual findings made by the district court in that context have no application to our review of the Board's order. NLRB v. Acker Indus., Inc., 460 F.2d 649, 652 (10th Cir. 1972).

testify at the hearing.  The adverse inferences were relevant to findings the ALJ made both with respect to the General Counsel's prima facie case, and Ready Mixed's rebuttal.

**II**

It is an unfair labor practice to "interfere with, restrain, or coerce the exercise" of employees' rights to "form, join, or assist labor organizations," 29 U.S.C. §§ 157, 158(a)(1), or to discriminate in hire or tenure "to encourage or discourage membership in any labor organization,"  29 U.S.C. § 158(a)(3).  It is a violation of the Act to fire an employee for having engaged in protected activities when there is no legitimate reason for the discharge, or the reasons offered are only pretexts.  NLRB v. Transportation Mgmt. Corp., 462 U.S. 393, 398 (1983).  If, however, "any antiunion animus that he might have entertained did not contribute at all to an otherwise lawful discharge for good cause," an employer does not violate the Act.  Id.  This rule is consistent with section 10(c) of the Act, stating that "[n]o order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of back pay, if such individual was suspended or discharged for cause."  29 U.S.C. § 160(c); see Transportation Mgmt., 462 U.S. at 401, n.6.

Following the Supreme Court's lead in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977), the Board has developed a two-part framework for analyzing "dual motivation" cases.  Initially, the General Counsel must establish that the employee's protected conduct was a "substantial" or "motivating" factor in the

discharge decision; thereafter the burden shifts to the employer to show that it "would have reached the same decision absent the protected conduct." Wright Line, a Division of Wright Line, Inc., 251 N.L.R.B. 1083, 1086-87 (1980), enf'd, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982); see also Mt. Healthy, 429 U.S. at 285-87. By shifting the burden, the employer's justification becomes an affirmative defense. The Supreme Court and this circuit have both approved the Wright Line test. See Transportation Mgmt., 462 U.S. at 403; Monfort, Inc. v. NLRB, 965 F.2d 1538, 1540 (10th Cir. 1992).

### III

Here, the ALJ applied the Wright Line test in first determining that the evidence supported the General Counsel's contention that Teter's protected activities were a motivating factor in his discharge. An employer's antiunion motivation often may be proven only by circumstantial evidence. Intermountain Rural Elec. Ass'n v. NLRB, 732 F.2d 754, 759 (10th Cir.), cert. denied, 469 U.S. 932 (1984); McLane/Western, Inc. v. NLRB, 723 F.2d 1454, 1459 (10th Cir. 1983). Proof of an employer's specific intent to discriminate is unnecessary; the evidence may provide a presumption of intent. Presbyterian/St. Luke's Medical Ctr. v. NLRB, 723 F.2d 1468, 1476 (10th Cir. 1983). On the evidence before it, the Board found that Teter was engaged in union activities at the time of his discharge, that Ready Mixed knew about his activities, that Joe Moseley, Ready Mixed's operations manager, exhibited antiunion animus, and that Teter was

subjected to harsher discipline for his transgressions than were past employees who similarly violated the company rules.

The General Counsel need not follow a rote formula to establish a prima facie case of discriminatory discharge. The totality of the evidence presented must establish directly or circumstantially that the employer had knowledge of employees' protected activities. See NLRB v. American Spring Bed Mfg., 670 F.2d 1236, 1245 (1st Cir. 1982). Beyond that, we and our sister circuits have approved many combinations of factors in concluding that the General Counsel carried its burden See, e.g., Intermountain Rural Elec., 732 F.2d at 759 (evidence showed union activist was "more than adequate" employee, supervisor made comments demonstrating hostility to her union activity, and incident prompting discharge seemed pretextual); Presbyterian/St. Luke's, 723 F.2d at 1476-77 (disciplined employees were known union activists and Board found the employer's explanation for discharge not credible); Hanlon & Wilson Co. v. NLRB, 738 F.2d 606, 614-15 (3d Cir. 1984) (prima facie burden met based solely on one statement by supervisor to union advocate that his union activity was bad for the company). The Board's findings in this case are all relevant to demonstrate a prima facie case of discrimination. We thus review whether the Board was entitled to make these factual findings, and whether upon the evidence in the record its conclusions are permissible.

Our review of the Board's factfinding is quite narrow. We must uphold the Board's factual findings if they are supported by substantial evidence in the record as a

whole.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88 (1951); Monfort, 965 F.2d at 1540.  Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Presbyterian/St. Luke's, 723 F.2d at 1471 (quoting Universal Camera, 340 U.S. at 477) (further quotation omitted).  We may not overturn a Board decision just because we might have decided the matter differently; rather, our function is to ascertain that "the Board acts within reasonable bounds and that the supporting evidence is truly substantial."  Id. at 1472.

Credibility determinations are particularly the province of the ALJ and the Board.  Id. at 1477.  We "refuse to substitute our judgment on the credibility of witnesses for that of the ALJ, absent 'extraordinary circumstances.'" McLane/Western, 723 F.2d at 1458 (quoting NLRB v. Dillon Stores, 643 F.2d 687, 692 (10th Cir. 1982)).  "[We] do not sit as a super trial examiner, and do not weigh the credibility of one witness against another, nor do we search for contradictory inferences." Osteopathic Hosp. Founders Ass'n v. NLRB, 618 F.2d 633, 636 (10th Cir. 1980) (quotations omitted).

Ready Mixed does not contest that Teter was engaged in protected activity at the time of his discharge.  There is substantial evidence supporting the finding that Teter spoke to perhaps half of the drivers about seeking union representation.  Ready Mixed does contest the Board's finding that it knew about Teter's union activities and that it exhibited antiunion animus.  In particular, Ready Mixed argues that Harrison, the

supervisor who fired Teter, had no knowledge of his union activities and exhibited no antiunion animus.

Viewing the record as a whole, we conclude that substantial evidence supports the Board's findings regarding Ready Mixed's knowledge. At the administrative hearing, Teter testified that he spoke with Joe Moseley, Harrison's superior, about the union. Curtis Jones, another supervisor, admitted he was aware of Teter's union activity. In addition, another driver testified that he told Moseley that Teter was soliciting union support from the drivers. While Harrison denied knowledge of Teter's union activities on direct examination, on cross-examination he admitted that he might have heard that "Terry Teter was pushing the union and Terry Teter was going to the union." Moreover, Ready Mixed did not call Moseley to testify about management's knowledge of Teter's union activities. From this failure to testify, the Board drew an adverse inference that Harrison had knowledge of Teter's activities, and found that Harrison was not credible in denying such knowledge.

The evidentiary rule that permits "adverse inferences" is a familiar one. It has been long accepted by the Board, "that when a party fails to call a witness who may reasonably be assumed to be favorably disposed to the party, an adverse inference may be drawn regarding any factual question on which the witness is likely to have knowledge." International Automated Machs., Inc., 285 N.L.R.B. 1122, 1123 (1987), enf'd, 861 F.2d 720 (6th Cir. 1988); see also United Auto Workers Int'l Union v. NLRB, 459 F.2d 1329,

1339 (D.C. Cir. 1972) (decision whether to draw the adverse inference lies with the factfinder). The rule has been applied in other civil contexts. See, e.g., Interstate Circuit, Inc. v. United States, 306 U.S. 208, 225-26 (1939) (failure of antitrust defendant to call company officers as witnesses "is itself persuasive that their testimony, if given, would have been unfavorable"). We conclude that in this case, the Board reasonably drew the adverse inference. Ready Mixed did not present any reason why it did not call Moseley, the record suggests Moseley should have known whether Harrison knew about Teter's union activities, and his testimony appears to be within the control of Ready Mixed. See NLRB v. Norbar, Inc., 752 F.2d 235, 240 (6th Cir. 1985) (inappropriate to draw adverse inference when absent witness no longer worked for employer). As an alternative basis for finding a prima facie case, the Board properly imputed Moseley's knowledge of Teter's activities to Ready Mixed. See Pinkerton's, Inc., 295 N.L.R.B. 538 (1989) (knowledge of a supervisor is attributable to the employer where the employer does not negate imputing such knowledge).

Substantial evidence also supports the finding that Ready Mixed exhibited antiunion animus. The only direct evidence of Ready Mixed's antiunion animus involves a conversation between Moseley and Teter in June 1994. According to Teter, he told Moseley that "somebody was liable to go to the union and try to get them to come back in," to which Moseley responded, "as long as he was there, those scum-sucking, lazy, sorry-ass son of a bitches wouldn't get back in." After Teter persisted, Moseley

purportedly told Teter that he did not want to hear "any more of your shit." The ALJ found Teter's account credible, particularly in light of Ready Mixed's failure to call Moseley to rebut Teter's testimony. These statements alone sufficiently indicate antiunion animus. Harrison admitted that the decision to discharge Teter, though based on his recommendation, was jointly made by him and Moseley.

Based on the evidence in the record as a whole, the Board's conclusion that Teter's protected union activity motivated his suspension and discharge is well supported. Much of the evidence supporting the Board's conclusions derives from the ALJ making credibility determinations from conflicting testimony. Each of these determinations is reasonably supported in the ALJ's decision. While there is evidence pointing both ways, "it is not our function to retry this case on a cold record." NLRB v. Blue Hills Cemetery, 567 F.2d 529, 530 (1st Cir. 1977).

**IV**

Once the General Counsel establishes a prima facie case, the burden shifts to the employer to prove "by a preponderance of the evidence that it would have discharged the employee, even if he had not engaged in the protected conduct." McLane/Western, 723 F.2d at 1459 (citing Transportation Mgmt., 462 U.S. at 398-99). Ready Mixed argues before us that Teter was discharged for his general bad attitude, his failure to wear a hardhat after many admonitions, his accident of August 31, and his failure to report the accident immediately. However, based on substantial testimony and exhibits

documenting Ready Mixed's response to accidents and safety infractions by other drivers, the Board found that Teter would not have been suspended or fired for the accident itself or for his failure to wear a hardhat. Because Teter had never in the past been disciplined for his attitude, and it was not a reason given in his discharge letter, the Board concluded that Teter's attitude was not a reason for his discharge. The Board also found that Teter received five raises before his discharge and he was assigned one of five new mixer trucks even though he was low in line of seniority. Substantial evidence supports each of these findings.

Ready Mixed's remaining justification for the discharge is Teter's failure to report his August 31 accident, which violated the strict company rule to report such events immediately. The parties advance different accounts of how and when the accident was reported. Harrison testified that he was unaware of the accident until a quality control inspector reported it to him on September 1, and that Teter's failure exhibited dishonesty for which he was fired. According to Teter, after he broke the manhole cover, the customer's supervisor at the job site called Ready Mixed about the accident in Teter's presence; Teter himself reported the accident to Harrison either that day or the next, and Harrison did not raise any concern about Teter's failure to report the accident personally when it occurred. The incident report prepared by Harrison on September 1 notes that the accident was reported by the customer, not by the driver. Teter's letter of suspension also states that the accident was reported on August 31, although Harrison testified that the

date in the letter was a typographical error. Based on ready Mixed's failure to call the quality control employee who purportedly first reported the accident to Harrison, the ALJ made an adverse inference that the employee would not have corroborated Harrison's testimony. To the extent Teter and Harrison's testimony conflicted on this point, the ALJ found Teter's version the more credible. The Board determined that the accident had been reported and that, consequently, Ready Mixed did not carry its burden of proving that Teter would have been fired regardless of his protected activity. From our review of the record, crediting Teter's testimony over Harrison's is reasonable.[3]

As noted above, our review is limited to ascertaining whether substantial evidence supported the Board's conclusion that Ready Mixed did not carry its burden. It is not for Ready Mixed to prove that it "could have discharged [Teter for his actions], but whether it *would* have done so regardless of [his] union activities." Presbyterian/St. Luke's, 723 F.2d at 1480. Based on the record as a whole, substantial evidence supports the Board's conclusion that Ready Mixed failed to prove by a preponderance of the evidence that it would have fired Teter in the absence of his protected activities.[4]

---

[3] In the alternative, the Board determined that even had Ready Mixed's version of events been credited, it still would not have discharged Teter for failing to report the accident in person and immediately. At least one other driver had failed to call in an accident immediately and had not been discharged. Moreover, a former dispatcher testified that sometimes accidents were reported by the customer, not the driver.

[4] Petitioner misunderstands the nature of the Wright Line test when it suggests that engaging in protected activities improperly insulates a bad employee from discharge for legitimate reasons. Such a formulation would be inconsistent with the Act, but that is not how the Wright Line test operates. If the employer can prove that it *did* discharge the employee for

## V

We have considered all of Ready Mixed's arguments in this case and find them unpersuasive. The Board's findings and conclusions are supported by substantial evidence in the record as a whole. The decision and order of the Board is ENFORCED in all respects.

---

legitimate, nondiscriminatory reasons no violation may be found. Here, Ready Mixed simply did not meet its burden.

No. 95-9533, Ready Mix Concrete Company v. National Labor Relations Board

**BARRETT**, Senior Circuit Judge, dissenting:


I respectfully dissent. My review of the entire record on appeal leads me to conclude that the Board's factual findings and conclusions are not supported by substantial evidence in the record as a whole.

In my view, there is not substantial evidence to support the ALJ's and the Board's finding that Ready Mix engaged in unfair labor practices when it suspended and then discharged employee Teter for repeated violations of safety and work rules. Furthermore, Teter was belligerent and vulgar in the workplace. There is no evidence that the company used Teter's activities to form a union as a reason for his termination. None of the other drivers came forward to support Teter before the Board.

The Board relied on Teter's testimony and inferences drawn therefrom to support its order. Ready Mix had some 50 drivers. Teter testified that he had spoken to some 29 of them about the union; however, only one driver, John Novak, turned up at the September 13th organizational meeting and even he did not sign a card indicating an interest in the union. A second meeting was called at the union hall on September 15th.

Attending were Teter and a Mr. Fraunenfeld, the union organizer. Only one driver, David Fleishman, showed up. No further organization meeting was called. The only possible employee support for the union, other than Teter, was that indicated by Novak. Thus, the "activity" involved in this case is exclusively that of Teter. After Teter's discharge, there were no other attempts made to organize the union.

There were no witnesses that Teter's discharge had any chilling effect on employees' attitude toward unions or union activity. There was no evidence of any action taken by the company concerning union activity. The burden of proving that a discharge was unlawfully motivated is upon the Board. "A finding of discrimination by the Board must be supported by substantial evidence; it may not rest upon flimsy evidence, mere inference or guesswork." N.L.R.B. v. First Nat. Bank of Pueblo, 623 F.2d 686, 693 (10th Cir. 1980). Even if we treat this as a "mixed motive" case, the company has carried its burden of showing that Teter would have been discharged absent any protected union activity. See Miera v. N.L.R.B., 982 F.2d 441, 446 (10th Cir. 1992)., cert. granted in part sub nom., ABF Freight Sys., Inc. v. N.L.R.B., ___ U.S. ___ (1993), and aff'd, ___ U.S. ___ (1994). Certainly, there is no evidence

-16-

here of any company coercion, threats or restraints.  <u>See</u>
<u>Presbyterian/St. Luke's Medical Ctr. v. N.L.R.B.</u>, 723 F.2d
1468, 1475 (10th Cir. 1983).

The company's actions taken toward Teter were not a
pretext for anything Teter did in relation to union activity.
In my opinion, the record supports the conclusion that Teter's
termination was fully justified.

I would set aside and vacate the Board's order and deny
enforcement.