McCONNELL, J.,
concurring in part and dissenting in part.
In labor parlance, a “salt” is a volunteer or professional organizer for a labor union who takes a job with an employer for the purpose of helping the union organize the workplace. In NLRB v. Town & Country Electric, Inc., 516 U.S. 85, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995), the Supreme Court held that a “salt” falls within the statutory definition of an “employee” under the National Labor Relations Act, 29 U.S.C. § 151 et seq., and thus is protected against discharge for engaging in protected union organizing activity. The Court emphasized, however, that employers have ample means for protecting themselves from the abuses that can arise from “salting” campaigns. The Court took note of what it called “the practical considerations” raised by the employer in that case, namely that “ ‘salts’ might try to harm the company, perhaps quitting when the company needs them, perhaps disparaging the company to others, perhaps even sabotaging the firm or its products.” Id. at 96, 116 S.Ct. 450. The court explained that “the law offers alternative remedies for [the company’s] concerns.” Id. One of these is: “A company faced with unlawful (or possibly unlawful) activity can discipline or dismiss the worker.” Id. at 97, 116 S.Ct. 450; see also NLRB v. Washington Aluminum Co., 370 U.S. 9,17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962) (allowing discharge for union-related acts that “show a disloyalty to the workers’ employer”). In my view, the case before us tests whether that remedy is truly available.
When an employer is charged with an unfair labor practice on account of discharging an employee, it is essential to distinguish between that worker’s protected and unprotected labor organizing activity. Timpte, Inc. v. NLRB, 590 F.2d 871 (10th Cir.1979); see Ready Mixed Concrete Co. v. NLRB, 81 F.3d 1546, 1550 (10th Cir.1996) (the General Counsel “must establish that the employee’s protected conduct was a substantial or motivating factor in the discharge decision”) (emphasis added). The Supreme Court made clear in Town & Country that a worker has no protected right to engage in acts designed to harm the company, even if these might have the indirect effect of pressuring the company to unionize. 516 *1038 U.S. at 96-97, 116 S.Ct. 450; see also Technicolor Gov’t Servs., Inc., 276 N.L.R.B. 383, 387, 1985 WL 46221 (1985) (employees’ activity “designed to injure their employer’s business have been found to be without the protection of the Act”). An employer is entitled to discharge a worker for disloyalty, even if his acts of disloyalty are part of a union organizing campaign. As the Supreme Court stated in NLRB v. Local Union No. 1229, IBEW, 346 U.S. 464, 472, 74 S.Ct. 172, 98 L.Ed. 195 (1953):
There is no more elemental cause for discharge of an employee than disloyalty to his employer. It is equally elemental that the Tafb-Hartley Act seeks to strengthen, rather than to weaken, that cooperation, continuity of service and cordial contractual relation between employer and employee that is born of loyalty to their common enterprise.
To hold the company liable when it discharges a worker for unprotected acts of disloyalty would upset the careful balance struck by Congress and described by the Court in Town & Country.
Disturbingly, in this case the administrative law judge (ALJ), affirmed by the Board, made no attempt to distinguish between legitimate labor organizing activity, which is protected by the Act, and the possibly unprotected acts of union “salts” that the employer contends were designed to harm the Company and thus to increase the pressure to give in to a unionization campaign. The ALJ lumped all of the activity together under the single rubric of “organizing activity,” without explaining why the relevant acts were protected. The decision below thus deprived the Company of the “alternative remedies” guaranteed under the labor laws. Town & Country, 516 U.S. at 96-97, 116 S.Ct. 450.
I
The first issue in this ease involves the discharge by Interstate Builders of John Norman, a full-time employee of the Iron-workers Union assigned to organize at the Company. The Company claims he was discharged for engaging in unprotected activity, namely persuading a fellow employee to join the Union, quit the company, and go work for a competitor.[1] The ALJ, affirmed by a three-member decision of the Board, found that the discharge was motivated by anti-union animus.
Uncontradicted evidence in the record shows that in February, 1998, Interstate Builders President Bill Napier, a former Union member, offered to sign an agreement to unionize, provided it would take effect three months thence. The Union refused this offer. The Union then initiated a campaign that the Company claims was designed to force it out of business. The Union instructed the eight or ten unionized iron workers at Interstate Builders to leave Interstate and to move to jobs with its competitors. They did so, leaving the Company short of workers to fulfill its contracts. Norman then applied for a job with Interstate. On his application form, despite almost twenty years of experience in ironwork, the sole “employment history” he mentioned was “Ironworker Local 48.” He also listed as “salary expected” an amount $6 per hour higher than the wage *1039 the Company paid for that position, $16 per hour. Tommy Young, an Interstate supervisor, testified, and Norman did not deny, that Norman told him “if he could not organize us, he was going to take our employees.”
Although not hired on his first application,[2] Norman was hired a month later, for $16 per hour. He was assigned to work on a two-man job with Richard Hopper. Hopper testified that during their two-and-one-half days working together, Norman “hound[ed]” him up to four times a day, telling him to stop working for Interstate because the Union needed him. Hopper also testified that Norman said that, “[I]f they can’t be a union company then we’ll want to get them out of business. We’ve got to get something on them.” The following Monday, Norman informed the Interstate foreman, Harry Young, that he had “signed [Hopper] to the Union” and that Hopper would not be returning to Interstate. Norman then complained that he could not do the work assigned alone and asked for another helper. Young asked why he should hire another worker, when Norman would just organize him and the Union would assign him to work for another company. Norman said that was his job as a Union organizer. Norman then demanded a pay increase. Young fired him. The question before us is whether Norman’s discharge was an unfair labor practice.
The ALJ specifically found that Norman was fired for persuading Hopper to join the Union and leave the Company:
Harry Young clearly expressed] his irritation with Norman by commenting that Norman would just organize any new helper (and induce him to leave as Hopper did), said he wouldn’t put up with “this shit,” and he then terminated him by telling Norman to get his check. Under these circumstances it is clear that Norman was fired because Young would not put up with Norman’s organizing efforts.
NLRB Order 9-10 (paragraph break omitted); see also id. at 9 (finding that the Company “became annoyed with [Norman] after lea[rn]ing that his coworker had left for a union job”). It is important to note that the ALJ makes no mention of any organizing activity by Norman other than these conversations with Hopper. Indeed, the record contains no evidence of any other organizing activity in which Norman was engaged during his brief stint with the Company. Neither the ALJ nor the Board suggested that Norman was discharged for labor organizing activity prior to his employment with Interstate. In any event, since the Company hired him in full awareness of his organizing activity, that would not be a plausible explanation of the facts.
Proper resolution of this case, then, hinges on the following legal question: Was Norman’s conduct in persuading Hopper to join the Union and quit the Company protected activity under the Act? The answer is unquestionably “no.” The Board has squarely held that inducing employees to quit is not protected labor organizing activity under the Act. Clinton Corn Processing Co., 194 N.L.R.B. 184, 185-86, 1971 WL 4005 (1971) (company’s actions were not unfair labor practices because they were motivated only by complainant’s “unprotected conduct in inducing [the company’s] employees to quit”); see also Technicolor Gov’t Servs., 276 N.L.R.B. at 389 (stating that a “solicitation to quit” by a *1040 union steward to fellow employees “would remove the Act’s protection”); Boeing Airplane Co. v. NLRB, 238 F.2d 188, 193-95 (9th Cir.1956) (employee’s service as agent seeking to place employer’s engineers with competitors was unprotected activity and valid ground for discharge). To convince other workers to quit and to work for competitors is an act of disloyalty, injurious to the employer, and is a legitimate basis for discharge.
In its brief in this Court, the Board does not argue that persuading other employees to quit is protected conduct under the Act. Instead, the Board disputes the Company’s factual contention that this was the reason for Norman’s termination. See Petitioner’s Br. 19 (“The Company failed to demonstrate that those reasons [the second of which was “Norman had induced another employee to quit the Company and work for a union contractor”] motivated it to fire Norman ....”); id. at 21 (“The Company’s newly minted assertion that it fired Norman because he ‘induced’ employee Hopper to quit is unsupported by any testimony from company decisionmakers that they discharged Norman for that reason.”) (citation omitted). However, the ALJ expressly found that this was the Company’s reason for firing Norman, and the Board affirmed.[3] The Board may not make arguments on appeal, nor could this Court affirm, on a legal basis that differs from the findings below. NLRB v. Kentucky River Community Care, Inc., 532 U.S. 706, 714 n. 1, 121 S.Ct. 1861, 149 L.Ed.2d 939 (2001); NLRB v. Bell Aerospace Co., 416 U.S. 267, 289-90, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); see generally SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); Mickeviciute v. INS, 327 F.3d 1159, 1162-63 (10th Cir.2003); St. Anthony Hosp. v. United States Dep’t of Health and Human Servs., 309 F.3d 680, 699 (10th Cir.2002).[4] Because the ALJ’s *1041 decision, affirmed by the Board, rested on an erroneous proposition of law, it must be reversed.
The majority states that “even assuming that Norman’s inducing Hopper to leave precipitated Interstate’s termination of Norman in part ... we agree with the ALJ that Interstate ‘failed to persuasively show that Norman would have been terminated even in the absence of his union activities.’ ” Op. at 1035-36 (quoting NLRB Order 10). With all respect, this misses the argument. The question is not whether Norman was discharged for engaging in “union activities”; the question is whether the particular “union activities” in which Norman engaged were protected conduct under the Act. It is established— and neither the Board nor the majority disputes' — -that inducing other employees to quit is unprotected conduct. Clinton Corn Processing, 194 N.L.R.B. at 186-87. The ALJ found — and neither the Board nor the majority disputes — that Norman persuaded Hopper to quit and that this incident was the reason for Norman’s termination. The ALJ’s opinion provides no basis for a holding that Norman would have been terminated in the absence of his activities toward Hopper. Because the only “union activities” identified by the ALJ were unprotected, it follows that there is no legal basis for affirming the enforcement order.
II
Whether the Board properly concluded that Interstate violated the Act when it refused to hire the four May 12 applicants is a closer question. I agree with the majority that the General Counsel established a prima facie case. But at the next stage of the analysis, Interstate makes a powerful claim that its refusal to hire was based on a firm rule against hiring workers through the Union. Because hiring through a union is incident to collective bargaining, an employer is not required under the labor laws to do so unless the union has been certified as the bargaining agent by majority vote of the workers in the relevant unit. NLRB v. Local Union No. 103, 434 U.S. 335, 344, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978). Section 8(f) of the NLRA permits, but does not require, employers in the construction industry to enter into “pre-hire” agreements with a union that has not attained majority status. 29 U.S.C. § 158(f). Interstate has entered into no such agreement in this case, and accordingly is not required to accept applications through the Union.
The principal dispute revolves around whether the four workers applied independently. In April, 1998, the Union mailed applications of the four workers directly to the Company. The Union was informed in writing that the Company did not accept the Union as representative of the applicants. The letter suggested that the applicants apply individually. On May 12, the applicants came to Interstate’s offices accompanied by Union agent Norman, who was not a job applicant. Only one of the applicants, John “Gib” Buntin, who was an executive board director for the Union, said anything at this meeting. Instead, Norman spoke for them.[5] Norman informed Tommy Young, the Company supervisor, that “he had four guys who wanted to fill out applications for employment.” Young asked whether the applicants were *1042 from the Union and on learning that they were, whether they had received the letter of April 9, informing the Union that the Company would not hire through Union representatives. Norman acknowledged receiving the letter, and replied that they were not “union representation.” Young answered that the Company “did not need any help” and that he would not accept the applications. As the men left Young’s office, Norman attempted to hand Young the applications. Young rejected them and said, “go file another goddamn complaint.”
To establish a prima facie case that an employer’s refusal to hire an applicant is an unfair labor practice, the General Counsel must show, among other things, that the employer’s anti-union animus contributed to the refusal to hire. FES (a Division of Thermo Power), 331 N.L.R.B. 9, 12, 2000 WL 627640 (2000). If the General Counsel establishes a prima facie case, the burden shifts to the employer to establish that the applicant would not have been hired even in the absence of the discriminatory motive. In this case, the ALJ found and the Board affirmed that there was substantial evidence of anti-union animus, based on other conduct by Interstate roughly contemporaneous with the events in question. NLRB Order 10. The ALJ also found and the Board affirmed that Interstate’s anti-union animus “was a motivating factor in its decision to not hire or not accept applications from the alleged discriminatees.” Id. The ALJ explained:
Here, Norman and the applicants engaged in a courteous and non disruptive effort to submit application^] and, otherwise, the Respondent made no effort to ask Norman to leave or ask that it be allowed to see or interview the applicants alone. Instead, it asked if they were union workers, it adamantly stated it did not want union representation, it rejected any explanation that they were there only to seek the jobs offered in the newspaper, it pretextually told them it didn’t need any help (when it was hiring other iron workers), and, with a display of rancor, it rejected an attempt to leave applications for consideration.
Id. at 11. The majority concludes, and I agree, that this constitutes substantial evidence supporting a prima facie case.[6]
*1043 But I depart from the majority at the next stage: the analysis of the Company’s defense. The Company claims that it had a legitimate nondiscriminatory justification for not hiring the four applicants: namely, its film policy against hiring workers who apply through Union representatives rather than individually. Neither the Board nor the majority questions that the Company has such a policy or that the policy is lawful. Neither the Board nor the majority questions that the policy applied to the situation on May 12. At the meeting on May 12, Norman, a Union representative, spoke for the applicants (three of whom said nothing during the meeting), and it was Norman — not the applicants — who attempted to hand Young the job applications. None of the individual applicants either spoke to Young to request a job or attempted on their own to submit an application.
The majority concludes that “the proffered explanation was pretextual.” Op. at 1036. Yet the sole evidence cited in support of this conclusion is a recitation of precisely the same evidence that constituted the prima facie case: evidence that Interstate harbored anti-union animus and that this animus was a contributing factor in the refusal to hire. Op. at 1037. The Board offered no evidence that the Company’s explanation was pretextual and no reason for weighing the evidence as it did. Where, as here, an employer has offered evidence that its challenged actions were based on a legitimate and non-discriminatory policy, the Board may not conclude that those actions were an unfair labor practice without taking the Company’s evidence into account. The Board is under no obligation to accept the Company’s justification, but it must consider the Company’s evidence and explain why it is unworthy of belief. The Board cannot simply look at the evidence on one side of the equation — the evidence of the Company’s anti-union bias — and disregard “contradictory evidence or evidence from which conflicting inferences could be drawn.” Universal Camera Corp. v. NLRB, 340 U.S. 474, 487, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
After the prima facie case is established and the Company has offered evidence of a legitimate reason for its actions, the relevant inquiry is no longer whether the Company harbored anti-union animus, but, as the majority acknowledges, whether it would have refused to hire the applicants even in the absence of anti-union animus. Op. at 1031-32 (citing Ready Mixed Concrete, 81 F.3d at 1550). To rebut the Company’s defense, there must be some evidence that the Company was inconsistent or insincere in its application of the policy, or perhaps — in an extreme case— that the Company’s anti-union animus was so predominant that any other reason for its actions is purely window-dressing. See NLRB v. Instrument Corp., 714 F.2d 324, 327-28 (4th Cir.1983) (“it is not enough for the Board simply to declare that the reasons offered by the employer were pretex-tual; the Board must advert to tangible evidence demonstrating why the good motive was not the sole reason” for the employer’s actions.). Neither the Board nor the majority has pointed to any such evidence in this case.
The ALJ focused exclusively on the words exchanged at the meeting on May 12. But nothing said at that meeting has any bearing on whether the Company’s policy of not hiring through the Union was pretextual. The ALJ found that Norman had declared that if Interstate “can’t be a union company then we’ll want to get them out of business.” NLRB Order 10. Young became angry at the meeting of May 12, suspecting the applicants of setting the company up for a “goddamn complaint” and sarcastically stating that the Company did not “need any help.” The *1044 ALJ, seemingly inconsistently, dismissed Norman’s threat as mere “braggado,” while treating Young’s “display of rancor” as evidence of impermissible motivation. NLRB Order 10,11. It is often difficult to distinguish an employer’s anger at a union’s tactics from the generic anti-union animus that the labor laws seek to remedy. One of the established tactics of a “salting” campaign is to provoke an employer to refuse to hire an applicant, and then to file an unfair labor practices charge with the Board. See Exterior Systems Inc., 338 N.L.R.B. No. 82, 2002 WL 31753333, at *13 (November 22, 2002) (Member Cowen, concurring) (referring to “a rising tide of cases in which union salts have behaved in a hostile, disrespectful, and/or intimidating manner during the application process with a clear purpose of inducing the employer not to hire them so that they could file unfair labor practices with the Board”). But an employer does not forfeit its right not to hire through a union merely because, in the heat of confrontation, company officers grow angry at what union representatives say or do.
Here, the evidence showed that Interstate has a policy of not hiring through a union that has not been chosen by the workers as their bargaining agent. There is no evidence that enforcement of the policy in this instance was pretextual. There was evidence that the union representative, Norman, was trying to drive the Company out of business, and that a Company official became angry at Norman during the meeting and said things he should not have said. I cannot agree with the majority that this is a sufficient basis for holding the Company liable for an unfair labor practice.
III
Because I conclude that the decision below is not entitled to enforcement on substantive legal grounds, it is not necessary for me to discuss in detail the procedural issue raised by the Company. I agree with the majority that the ALJ abused his discretion in revoking substantial portions of the Company’s subpoena. I point out only that the ALJ’s explanation for this decision was of a piece with his treatment of the Company’s defenses both as to Norman and as to the four job applicants. The ALJ found that the subpoena was “not relevant” because the Company’s “request would appear to be a collateral attack on the Union’s organizing practices or ‘salting’ program.” NLRB Order 8. Like the majority (Op. at 1030), I am uncertain what the ALJ meant by a “collateral attack,” but the gist is clear. The ALJ did not consider the Company’s defense — that its discharge of Norman and refusal to hire the four applicants were related to its resistance to the abuses of a “salting” campaign — relevant to the unfair labor practices charge. In much the same vein, the ALJ dismissed Norman’s explicit statement that if Interstate “can’t be a union company then we’ll want to get them out of business” as mere “braggado.”
The Company believed that the documents it subpoenaed would corroborate its side of the story: that the Union was attempting to drive it out of business by stripping the Company of workers, and that the four applicants were not bona fide applicants for a job, but simply attempting to provoke an unfair labor practices complaint. The ALJ held that the documents were “not relevant” and that the Company’s subpoena was a “fishing expedition.” As the majority correctly holds, those explanations do not stand up to scrutiny. Worse yet, they suggest that the ALJ was simply not receptive to hearing the Company’s side of the story.
I therefore join the majority insofar as it grants enforcement of the portions of the *1045 order below that are not challenged by the Company; and otherwise respectfully dissent.

. The Company also asserted a second justification for the discharge: that Norman demanded a $6 per hour pay raise. Respondent's Br. 24. The majority affirms the finding below that this was a pretext. Op. 1034-35. Because I believe there was substantial evidence to support the ALJ's con-elusion that “it is clear that Norman was fired because [the Interstate official who fired Norman] would not put up with Norman's organizing efforts,” NLRB Order 10, I will not further discuss this alternative ground.

. The ALJ found and the Board affirmed that the Company’s refusal to hire Norman on this occasion was an unfair labor practice. Interstate does not challenge that finding on appeal.

. The Board's argument in its brief, “that Hariy Young's complaint to Norman — that 'you’ll just organize' any new workers that would be assigned to Norman' — was, by its own terms, directed at Norman’s organizing activity and not at his inducing Hopper to leave,” Petitioner’s Br. 21, is inconsistent with the ALJ’s finding that the Company “became annoyed with [Norman] after lea[rn]ing that his coworker had left for a union job.” NLRB Order 9. The Board's three-word quotation of Young (“you'll just organize”) strips those words of their context. After persuading Hopper to quit — just as all other members of the Union had quit — Norman asked Young to hire another worker to work with him. When Young asked “why, because Norman would just organize them,” id., it is apparent from the context that Young understood that Norman's intention was to persuade workers who joined the Union to quit, making it pointless to hire new co-workers for him. To the extent the Board now argues otherwise, the argument is precluded by the ALJ's finding, affirmed by the Board, that "Harry Young clearly expresse[ed] his irritation with Norman by commenting that Norman would just organize any new helper (and induce him to leave as Hopper did),” NLRB Order 9-10 (emphasis added).

. The Board also argues that we may not consider Interstate’s argument that it fired Norman because he induced Hopper to quit because Interstate failed to preserve that argument in proceedings before the Board. Generally, an "objection that has not been urged before the Board, its member, agent, or agency, shall [not] be considered by the court.” 29 U.S.C. § 160(e). However, Interstate was not required to object to the ALJ’s finding that it fired Norman because of his activities with respect to Hopper, because Interstate now agrees with that finding. The relevant inquiry is whether Interstate objected to the ALJ’s legal conclusion that Norman's activities were protected under the Act. It clearly did so. In its brief to the Board in support of exceptions to the ALJ opinion, Interstate pointed to Norman's statements regarding the Union’s campaign to drive Interstate out of business by stripping its employees and specifically argued that inducing employees to quit is unprotected conduct. Respondent's Br. in Support of Exceptions to the Decision of the ALJ,-. This objection was sufficiently specific to al *1041 low the Board to consider and rule on the issue, which the Board did by affirming the ALJ. See May Dept. Stores Co. v. NLRB, 326 U.S. 376, 386 n. 5, 66 S.Ct. 203, 90 L.Ed. 145 (1945).

. On cross-examination, Norman was asked whether he spoke for the applicants at the meeting. He responded: "Some of them." R. vol. 1,69.

. Under the NLRB's current jurisprudence, there is some uncertainty whether the General Counsel must also show, as an additional element, that the applicants were genuinely interested in gaining employment and not attempting to provoke the employer into not hiring them so as to provide grounds for an unfair labor practice charge. In Exterior Systems Inc., 338 N.L.R.B. No. 82, 2002 WL 31753333 (November 22, 2002), the Board held that an employer did not commit an unfair labor practice when it refused to hire a Union "salt” who behaved disrespectfully toward company officials when he applied for a job. Two members of the Board stated in separate concurrences that, under Supreme Court and NLRB precedent, the General Counsel must show that the intent of the "applicant” is to gain employment rather than to provoke a grievance. See id. at *11, *16. In this case, there is considerable evidence that the May 12 applicants intended such a provocation. It seems unlikely that genuine job seekers would come to the site with union representation in direct violation of instructions the Company had sent the previous month. In addition, if their goal was to obtain a job rather than to generate controversy, it was highly imprudent of them to select as their spokesman a man whom the Company had fired less than two months previously and who was actively involved in litigation against the Company. Finally, Norman's instructions to Hopper, in which he asked Hopper to help the Union get Interstate on OSHA violations and insisted "we’ve got to get something on them,” suggested that creating grounds for litigation was one of the goals of the Union's "salting” campaign. Nevertheless, because the Company does not press this argument on appeal, and in light of the deference due to the ALJ's conclusion that the four men were "bona fide applicants,” I concur with the majority's conclusion regarding the Board’s prima facie case.