**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 4, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

WYNNEWOOD REFINING
COMPANY,

        Petitioner,

v.

SECRETARY OF LABOR,

        Respondent.

No. 08-9572
(OSHC-1: 07-0609)
(Petition for Review)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, **BALDOCK**, and **HOLMES**, Circuit Judges.

---

Wynnewood Refining Company (Wynnewood) petitions for review of the

determination of the Occupational Safety and Health Review Commission

(Commission) that it willfully violated a process safety management standard

under the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678

(OSHA). We have jurisdiction under 29 U.S.C. § 660(a), and deny the petition.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

**I**

Wynnewood owns and operates a petroleum refinery in Oklahoma. The refinery's alkylation (Alky) unit, which operates under pressure, uses hydrofluoric (HF) acid to convert hydrocarbons into gasoline. At the completion of this process, an acid relief neutralizer (ARN) "scrubs" the HF acid from the mixture before it is released to the flare line — an approximately 100-foot section of a fourteen to sixteen-inch diameter pipe that runs from the Alky unit to the refinery's main flare. "HF acid is corrosive and dangerous[.]. . . The ARN scrubs the HF acid to, among other things, ensure that it does not injure employees." Pet'r Opening Br. at 5.

In early 2004, Wynnewood performed a "turnaround" of the refinery in which all equipment was shut down, inspected, and repaired if necessary. The flare line was inspected during this process and found to be in compliance with the minimum acceptable thickness requirement of .22 inches.[1] However, just a few months later, in June 2004, the line developed its first of many leaks. The initial temporary repair method selected by Wynnewood was to wrap the line with a fiberglass product called Perma Wrap and put a clamp on the repair.

---

[1] Under 29 C.F.R. § 1910.119(d), Wynnewood is required to have an inspection manual that establishes the parameters for its process equipment. In turn, Wynnewood's manual sets out the "minimum acceptable thickness" for fourteen to sixteen-inch process piping such as the flare line at .22 inches. R., Vol. IV at 01584.

Concerned about the number of leaks and the apparent ineffectiveness of the Perma Wrap repairs, Wynnewood's chief inspector, David Long, hired an outside party in November 2004, to test the thickness of the line. The testing established that the line was at or below the minimum acceptable thickness of .22 inches at twelve locations. These findings were presented to management during a February 2005 meeting, in which Mr. Long also recommended replacing portions of the line. Management, however, rejected this recommendation and continued its course of temporary repairs.

In addition to the recurrence of leaks in areas that had been repaired, the flare line continued to develop new leaks. Some two or three months after the first repair, Wynnewood discovered that Perma Wrap was ineffective because it could not resist HF acid. Still, it continued to use Perma Wrap while it looked for an alternative temporary repair method. Wynnewood eventually switched to a modified Belzona repair method, which involved applying Belzona (an adhesive) to the leak and clamping a half piece of metal pipe over the repair.[2]

In September 2005, Mr. Long took new thickness readings of the flare line, which showed "quite a bit of metal loss[,]" R., Vol. I at 89, since the November 2004 test. Despite these additional findings, management again ignored his

_____

[2]     The traditional use of Belzona consists of applying the product to a pipe and welding a metal plate to the repair area; however, because the flare line contained flammable gases it could not be safely welded and, instead, a clamp was used to secure the metal plate to the line.

recommendation to replace the line. At or about the same time, Tommy Harris, the manager of maintenance and construction, also recommended replacement. He was "told to look for other alternatives to repair the line because we couldn't shut the unit down." *Id.*, Vol. II at 322. Specifically, he requested permission to replace the line from Wynnewood's assistant plant manager and vice president, who told him it "was not economically feasible[.]" *Id.* Mr. Harris and his department took it upon themselves to fabricate a new section of flare line and informed management about the project. The new section was completed in late 2005, but it was never installed. Instead, management decided to put off replacement until the next scheduled "turnaround" in 2008, despite the fact that the modified Belzona repair method was also proving to be ineffective.

In March 2006, the technician in charge of monitoring the Alky unit, Wesley Walker, presented himself at the daily maintenance meeting to express his mounting concerns about the flare line. Witnesses described his attendance as unusual because non-managerial employees typically did not attend these meetings. He reported pressure-control problems in the Alky unit and employees' concerns that the patches on the line would not hold during the venting process. He also relayed an incident where a spray or mist had leaked from the line and contacted a worker's protective equipment. Although it had been nearly two years since the initial leak, Wynnewood was looking at yet another temporary repair method — "a different type of patch[,] . . . sheet Teflon[,] . . . that [] would

have a greater resistance to acid degradation than what the fiberglass patch was." *Id.* at 470. "[T]hey didn't know how they were going to seal the ends of [] it so that it would contain the acid if there was a [release]. But [they] said that they could put the Teflon on and then they could wrap it with the fiberglass on the outside for strength." *Id.* at 470-71. Mr. Walker was told that in the meantime, a new flare header was being built so the line could be replaced. At or near this time, Wynnewood placed a barricade under a section of the line that, despite multiple repairs, continued to leak.

In response to a complaint about the flare line and other matters, Casey Perkins, an OSHA compliance safety and health officer (CSHO), arrived at the refinery on May 9, 2006. He conducted an opening conference, during which he explained that he "would be giving [Wynnewood] a document request[,]" *id.*, Vol. IIA at 660, and attended Wynnewood's safety orientation. The next day, May 10, he conducted an "initial walk-around[,]" *id.* at 661, with refinery personnel, during which he took photographs and observed some, but not all, of the areas where repairs had been made because he did not have the required protective equipment. In addition, CSHO Perkins testified that he could not complete his inspection because

> we had not collected the documentation on the process to know the
> documented hazard to the process. We did not know how the
> refinery had evaluated and made repairs to the flare line. We did not
> know how long those repairs had been ongoing and we did not know
> the overall condition of the unit or the overall exposure to employees

that were on site. And while we're on site on May 9th and May 10th we were also told that the alkylation unit was in circulation mode which means it's sort of in a static state of operation where no feed is being introduced to the unit and therefore no alkaloid is being produced. And therefore the pressures and operating conditions of the unit are not totally active.

*Id*. at 718.

On May 12, 2006, a fire erupted in the Alky unit that burned for several days. One cause of the fire was a rip in the flare line where several repairs had been attempted, which released a cloud of vapor, and which in turn ignited. After learning of the fire, CSHO Perkins returned to Wynnewood to complete his inspection. At the conclusion of the investigation, he issued Wynnewood a citation for multiple OSHA violations, including a willful violation of 29 C.F.R. § 1910.119(j)(5) for its failure to correct the deficiencies in the line in a safe and timely manner.[3]

Following a four-day hearing, an administrative law judge (ALJ) issued a detailed decision and order dated August 4, 2008, in which she found Wynnewood willfully violated § 1910.119(j)(5). Wynnewood's petition for review was denied by the Commission without directing further review, which made the ALJ's decision the Commission's final order. 29 U.S.C. § 661(j).

---

[3] The parties settled the other alleged violations.

## II

The single issue on review is whether substantial evidence supports the Commission's finding that Wynnewood willfully violated § 1910.119(j)(5), which requires an employer to "correct deficiencies in equipment that are outside acceptable limits . . . before further use or in a safe and timely manner when necessary means are taken to ensure safe operation." A violation "is willful if done knowingly and purposely by an employer who, having a free will or choice, either intentionally disregards [an OSHA safety] standard or is plainly indifferent to its requirement." *Kent Nowlin Constr. Co. v. Occupational Safety & Health Review Comm'n*, 593 F.2d 368, 372 (10th Cir. 1979) (quotation omitted).

Our standard of review is codified in 29 U.S.C. § 660(a), which provides that the "findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." In turn, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *Slingluff v. Occupational Safety & Health Review Comm'n*, 425 F.3d 861, 866 (10th Cir. 2005) (quotation marks omitted). This court's role is "narrow and highly deferential to OSHA and the Secretary[,]" *Tierdael Constr. Co. v. Occupational Safety & Health Review Comm'n*, 340 F.3d 1110, 1114 (10th Cir. 2003), and we neither re-weigh the evidence, second-guess the factual inferences drawn

-7-

therefrom, nor substitute our judgment on the credibility of witnesses, *Ready Mixed Concrete Co. v. NLRB*, 81 F.3d 1546, 1551 (10th Cir. 1996).

There were several grounds on which the ALJ based her finding of willfulness, and contrary to Wynnewood's arguments, each is supported by substantial evidence. As its overarching argument, Wynnewood claims that the ALJ failed to consider "its good faith efforts to correct deficiencies on the flare line[,] [which] includes the ultimate step of complete replacement." Pet'r Opening Br. at 20. To the contrary, citing, in part, *Secretary of Labor v. J.A. Jones Construction Company*, 1993 WL 61950, at \*9 (O.S.H.R.C. Feb. 19, 1993), the ALJ specifically acknowledged that

> [a]n employer's good faith efforts to correct a hazard, even if not entirely effective, can negate willfulness; however, whether an employer acted in good faith is an objectively reasonable test. Thus, if an employer's measures to address a hazard were to maintain production rather than a genuine effort to abate the hazard, the violation will be found to be willful.

R., Vol. VIII, Doc. 38 at 24.

Given that the ALJ applied the proper legal standard, our role is not to re-weigh the evidence, but to determine whether the ALJ's findings that Wynnewood did not act in good faith are supported by substantial evidence. We conclude that they are. Among other things, the ALJ noted that Wynnewood discovered the first leak in June 2004, and by February 2005, it knew the line had corroded to the extent that it was below the minimum acceptable thickness

requirement. Nonetheless, it used temporary repair methods that were ineffective for nearly two years. And in the face of evidence that demonstrated significant further corrosion, management continued to ignore recommendations to replace the line because it "was not economically feasible." *Id.*, Vol. II at 322.

Wynnewood next claims that the ALJ erred in finding that the decision to replace the flare line was not made until after OSHA began its inspection on May 9, 2006. In particular, it claims that the ALJ failed to adequately credit Mr. Long's testimony that his best recollection was that the decision to replace the line was made prior to OSHA's first visit: "I believe that OSHA came in on like a Wednesday, the fire was a Friday, and I believe the Monday of that same week was – basically had been determined that the following Monday, which is the Monday after the Friday fire, that the line was going to be replaced." *Id.*, Vol. I at 133. To be sure, the ALJ found Mr. Long to be generally credible; however, she acknowledged a conflict in the evidence on this issue, cited the "equivocal" nature of his and similar testimony, *id.*, Vol. VIII, Doc. 38 at 27, and concluded that "the weight of the evidence shows [that management] made the decision to shut down the line after OSHA arrived." *Id.* Substantial evidence supports this conclusion. *Id.* at 26-28. Further, this was only one of several reasons why the ALJ found the violation was willful.

Wynnewood also takes issue with the ALJ's finding that it "had both a management change of policy . . . and a temporary repair procedure . . . that,

if followed, would have resulted in appropriate action as to the flare line."
*Id.* at 25. Wynnewood admits that it did not follow its own policies, but argues that this evidence cannot support a finding of willfulness because the ALJ "never considered the reason why the failure to follow certain procedures occurred." Pet'r Opening Br. at 30. However, there was nothing for the ALJ to consider in light of Wynnewood's failure to offer any explanation for its non-compliance.

Last, the refinery argues that the ALJ erred by failing to consider its "excellent safety record[,]" *id.* at 28, and OSHA "never once questioned Wynnewood's management on the measures taken[,]" *id.* at 29, when it was at the facility on May 9 and 10, 2006. As for its alleged "excellent safety record," the Commissioner correctly points out that no such record exists because there were no known inspections prior to May 9. R., Vol. IIA at 731. And as previously discussed, the site visit was the first stage of the inspection, and OSHA was waiting for documentation regarding the flare line to consider, among other things, the efficacy of its temporary repairs.

The petition for review is denied.

Entered for the Court

Bobby R. Baldock
Circuit Judge

-10-